| | |
|---|---|
| JEAN T. LIVINGSTON, Derivatively on Behalf of ARCHER-DANIELS-MIDLAND COMPANY, | Case No: |
| Plaintiff, | |
| v. | |
| JUAN LUCIANO, MICHAEL BURKE, THEODORE COLBERT, JAMES COLLINS, TERRELL CREWS, ELLEN BRABANDER, SUZAN HARRISON, PATRICK MOORE, DEBRA SANDLER, LEI ZHANG SCHLITZ, KELVIN WESTBROOK, VIKRAM LUTHAR, and RAY YOUNG, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and, | |
| ARCHER-DANIELS-MIDLAND COMPANY, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by and through her undersigned counsel, derivatively on behalf of Archer-Daniels-Midland Company ("ADM" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

<h2 style="text-align:center"><strong><u>NATURE OF THE ACTION</u></strong></h2>

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from April 30, 2020 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      The Company is an agricultural supply chain manager and processor that operates through three (3) main business segments: Ag Services and Oilseeds, Carbohydrate Solutions, and Nutrition.  The Nutrition segment is engaged in the manufacturing, sale, and distribution of a range of ingredients and solutions, including plant-based proteins, natural flavors, flavor systems, natural colors, emulsifiers, and other specialty food and feed ingredients.

3.      Over the past 10 years, the Company has spent billions of dollars trying to expand its Nutrition business to protect against commodity price volatility in its legacy agricultural commodities trading business.  The Company first acquired WILD Flavors in 2014 for $3 billion and most recently, towards the end of 2023, announced it would acquire UK-based flavor and ingredient firm FDL.  However, the Company's string of investments in animal feed and pet nutrition did not meet expectations, the Company's Nutrition segment was under increased pressure resulting from weak demand for meat alternatives and other products as well as downtime at a large soy processing facility.  In October 2023, the Company reported that Nutrition revenues had decreased 4% to $1.8 billion due to lower sales volumes, Nutrition operating profit had decreased 22%, and both Human and Animal Nutrition results were lower compared to the third quarter of 2022.

4. Defendants made false and/or misleading statements, as well as failed to disclose material facts, about the performance and prospects of the Company's Nutrition segment and its accounting practices. Specifically, Defendants made positive statements about the Nutrition segment as a future profit-driver for the Company, with the ability to capitalize on healthier eating trends and rising consumer demand for natural ingredients and flavoring. Defendants also created the impression that the Nutrition segment's growth would provide more diversification and earnings stability for ADM. This was an appealing strategy because the Company's results were historically tied to the highly cyclical commodities market.

5. Unbeknownst to shareholders, however, the Nutrition segment's growth from 2020 through 2022 was inaccurate and subject to improper accounting practices, and Defendants also downplayed the segment's eventual decline in 2023. As ADM was aggressively acquiring companies to expand its capabilities in Nutrition, shareholders were under the impression that the segment was growing rapidly. In truth, Defendants' accounting practices for the segment misrepresented its true financial results and prospects, including its operating profits ("OP"). Defendants were incentivized to create the appearance of a diversified business by inflating the performance of the Nutrition segment, and certain Defendants were further incentivized by stock awards that were directly tied to the performance of the Nutrition segment from 2020 to 2022. As a result, the Company's business and prospects were much worse than represented, causing the price of ADM common stock to trade at artificially inflated levels.

6. On January 21, 2024, the Company announced that it had placed its Chief Financial Officer ("CFO") Vikram Luther on leave. The Company stated that Mr. Luther's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition

segment, including as related to certain intersegment transactions." The Company also stated that its investigation was initiated in response to its receipt of a voluntary document request by the SEC. As a result, the Company delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.

7.     On this news, the Company's common stock dropped by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024, wiping out approximately $8.8 billion of the Company's market value.

## JURISDICTION

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received

4

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

11. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

12. *Plaintiff Jean T. Livingston* ("Plaintiff") is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

13. *Nominal Defendant Archer-Daniels-Midland* is a multinational food processing and commodities trading company incorporated in Delaware with its headquarters located at 77 West Wacker Drive, Suite 4600, Chicago, Illinois, 60601.

### Director Defendants.

14. *Defendant Michael Burke* ("Burke") is the retired Chairman and has served on the Board since May 2018. Defendant Burke serves as chair of the Audit Committee, and a member of the Executive and Nominating and Corporate Governance committees.

15. *Defendant Theodore Colbert III* ("Colbert") has served on the Board since May 2021. Defendant Colbert serves as a member of the Audit and Compensation and Succession committees.

16. **Defendant James Collins Jr.** ("Collins") has served on the Board since August 2022. Defendant Collins serves as a member of the Compensation and Succession, and Sustainability and Corporate Responsibility committees.

17. **Defendant Terrell Crews** ("Crews") has served on the Board since May 2021. Defendant Crews serves as lead director and a member of the Executive Committee.

18. **Defendant Ellen de Brabander** ("Brabander") has served on the Board since 2023. Defendant Brabander serves on the Audit and Sustainability and Corporate Responsibility committees.

19. **Defendant Suzan Harrison** ("Harrison") has served on the Board since May 2017. Defendant Harrison serves as Chair of its Sustainability and Corporate Responsibility Committee as well as a member of the Executive and Audit committees.

20. **Defendant Patrick Moore** ("Moore") has served on the Board since November 2023. Defendant Moore is Chair of its Nominating and Corporate Governance Committee and serves as a member of the Executive and Audit committees.

21. **Defendant Debra Sandler** ("Sandler") has served on the Board since May 2016. Defendant Sandler serves as a member of the Audit and Nominating and Corporate Governance committees.

22. **Defendant Lei Zhang Schlitz** ("Schlitz") has served on the Board since May 2019. Defendant Schlitz is a member of the Compensation and Succession, and the Sustainability and Corporate Responsibility committees.

23. **Defendant Kelvin Westbrook** ("Westbrook") has served on the Board since November 2003. Defendant Westbrook serves as Chair of the Compensation and Succession

Committee and as a member of the Executive, and the Nominating and Corporate Governance committees.

24.     The above-named defendants at ¶¶ 12–21 are referred to herein as the "Director Defendants."

## Officer Defendants

25.     **_Defendant Juan Luciano_** ("Luciano") has served as Chief Executive Officer ("CEO") and President of the Company since January 2015, and as Chairman of the Board since January 2016.  Defendant Luciano also serves as a member of the Executive Committee

26.     **_Defendant Vikram Luthar_** ("Luthar") served as Chief Financial Officer ("CFO") of the Company beginning in April 2022 and as Senior Vice President of the Company beginning in March 2015. Company director since 2004.  Defendant Luthar previously served as Chief Financial Officer of the Company's Nutrition business segment from January 2020 to April 2022.

27.     **_Defendant Ray Young_** ("Young") served as CFO of the Company from December 2010 until April 2022.  After transferring the title of CFO to Luthar, Defendant Young assumed the position of Vice Chairman of the Company before retiring at the end of 2022.

28.     The above-named defendants at ¶¶ 23–25 are referred to herein as the "Officer Defendants."

## Former Director Defendants

29.     **_Defendant Francisco Sanchez_** ("Sanchez") served on the Board since from May 2014 to May 2023.  Defendant Sanchez served on the Audit Committee. Defendant Sanchez signed and thus personally made the false and misleading statements contained in the 2020, 2021, and 2022 Annual Reports, as detailed _infra_.

30.     **Defendant Donald Felsinger** ("Felsinger") served as Lead Director and on the board from 2009 to May 2023. Defendant Felsinger signed and thus personally made the false and misleading statements contained in the 2020, 2021, and 2022 Annual Reports, as detailed *infra.*

31.     **Defendant Pierre Dufour** ("Dufour") Defendant Dufour served on the Board from 2010 through to 2022. Defendant Dufour was a member of the Board's Audit Committee and Sustainability and Corporate Responsibility Committee. Defendant Dufour signed and thus personally made the false and misleading statements contained in the 2020 and 2021 Annual Reports, as detailed *infra*.

32.     The above-named defendants at ¶¶ 27–29 are referred to herein as the "Former Director Defendants."

33.     The Director Defendants, Officer Defendants, and Former Director Defendants are collectively referred to herein as the "Individual Defendants."

## FACTS

**Background:**

34.     The Company is a multinational food processing and commodities trading corporation that engages in the production of oilseeds, corn, wheat, cocoa, and other agricultural commodities.  It operates through three main segments: Ag Services and Oilseeds, Carbohydrate Solutions, and Nutrition. *The Ag Services and Oilseeds* segment includes activities related to the origination, merchandising, transportation, and storage of agricultural raw materials, and the crushing and further processing of oilseeds such as soybeans and soft seeds cottonseed, sunflower seed, canola, rapeseed, and flaxseed into vegetable oils and protein meals. *The Carbohydrate Solutions* segment mainly consists of corn and wheat wet and dry milling, and *the Nutrition* segment serves various end markets including food, beverages, nutritional supplements, and feed

and premix for livestock, aquaculture, and pet food. Before increasing its focus on nutrition, the Company's business primarily focused on buying, selling, and processing raw materials such as soy and corn beans.

35.     Historically, the Company and its two primary competitors, Bunge Global SA ("Bunge") and Cargill Inc. ("Cargill"), focused on buying, storing, and selling grain and profiting from exclusive information about supply and demand.   As technology advanced and facilitated the spread of information, the Company and its competitors sought to diversify their business. Cargill entered the meat processing business and the Company expanded into nutrition, increasing its focus on providing customers with products to help them change the formulation of processed food, such as reducing sugar content while preserving sweetness, or alter its appearance.   The Company's historical business is also facing the threat of increased competition for soybeans processing in the United States, as well as declining margins for soybean crushing and ethanol, for which the Company is the third-largest United States producer. As a result, successful diversification and growth of the Nutrition segment would continue to benefit the Company's revenue and stability.

36.     Prior to the start of the Relevant Period, the Company began ramping up growth in the Nutrition segment, beginning with the $3 billion acquisition of WILD Flavors in 2014, which remains the Company's largest acquisition to date.  The Company also completed a $1.8 billion acquisition of Neovia, an animal feed maker, in February 2019.  In a press release reporting the acquisition of Revela Foods in December 2023, the Company stated that: "[o]ur flavors business is an important pillar of our Nutrition growth strategy, and we are continuing to add to our flavors pantry to ensure we remain the partner of choice for customers around the globe."  The Company touted the growth to its flavors portfolio through acquisitions, "including savory via Eatem Foods;

citrus via Florida Chemical Company and Erich Ziegler Citrus; and vanilla via Rodelle" and stated that it "expanded its flavors capabilities globally" with acquisitions including Flavor Infusion South America, organic investments including facilities in China and Germany, and a "growing network of innovation centers spanning Europe, Asia, Latin America and North America."

37.    In February 2020, the Company reported that Nutrition operating profit increased 23%, compared to a 9% increase the previous year.  One month later, in March 2020, the Company disclosed changes to the short-term and long-term incentive compensation plans for performance periods beginning in 2020 that were "designed to emphasize our focus on the Nutrition segment of our business."  In January 2021, Defendant Luciano reported that the Company's Nutrition business was expected to enter a period in which annual operating profit growth would average 15%, and operating earnings for the Nutrition segment indeed rose more than 20% that year. Yet despite these representations to the contrary, that growth was not sustainable.  In 2022, Nutrition operating profit was only 7%, and earnings shrank by approximately one fifth in 2023.

38.    Despite these results, Defendant Luthar reported that he expected continued growth in the Nutrition revenue opportunity pipeline in October 2023 "with significant conversions continuing as ADM moves past some near-term demand weakness."  The Company also continued to push forward with its aggressive M&A strategy, announcing two additional acquisitions for the Nutrition segment in December 2023, Revela Foods and FDL.  In a press release reporting the Revela Foods acquisition on December 18, 2023, the Company touted its prior flavors investments, stating "ADM is continuing to add to its broad portfolio of flavor ingredients and solutions as it builds a global leader in nutrition."

39.    In truth, Defendants were not in a position to make such statements about the Company's prospects in the Nutrition segment.  As a result of these misleading statements and

omissions, shareholders were unaware that the Company's accounting practices were obscuring the true performance and growth of the Nutrition segment and impacting the accuracy and reliability of the Company's financial statements.

<u>**MATERIALLY FALSE AND MISLEADING STATEMENTS**</u>

40.    On April 30, 2020, the Company held an earnings call concerning its financial results for the first quarter of 2020.  During the call, Defendant Young stated:

> ***Nutrition continued its growth trajectory with <u>record results</u>. Our Human Nutrition business, formerly known as WFSI, delivered strong performance and growth across the broad portfolio, including Flavors, Specialty Ingredients and Health & Wellness. Increased sales revenue in North America and EMEA flavors, continued sales growth in alternative proteins and additional bioactives income helped drive improved results***. As Juan mentioned earlier, we did see higher demand in some Human Nutrition areas as a result of new wins as well as some pantry loading effects. Animal Nutrition's improved year-over-year results were driven by a strong performance from Neovia, good volumes and margins in feed additives and solid sales in pet care. The prior year quarter also had been negatively impacted by about $10 million in upfront purchase price adjustments related to Neovia. Amino acids were negatively impacted by a year-over-year decline in the global pricing environment, though prices were directionally improved over Q4 of 2019. We are also very pleased that we met our Neovia synergy targets more than 2 years early.

41.    Defendant Young further stated: "***For Nutrition, we feel confident that the business will continue to advance to another calendar year of 20%-plus growth.***"  In response to an analyst's question about the growth of the Nutrition business, Defendant Luciano stated:

> When talking about Nutrition, I said to all our investors over the last 1.5 years that they've been supporting us through all the investment phase in Nutrition. And Nutrition have not been showing that in the P&L because this was organic growth, and we have some growing pains into some of these assets as you build them and you have to finance them. But when you see now what's starting to happen is what we predicted before, is all those wins, all that innovation, we always said, we have our value proposition is resonating with our customers. We had that. That line was a little bit masked by all this organic growth that was coming.  ***Now all that organic growth is hitting the P&Ls because these investments are maturing. And you're going to see that, and we grew 23% profit last year. We are growing – we're going to grow another north of 20% this year.*** You see WFSI during this. So take Neovia

11

and Animal Nutrition out for a minute since the first quarter is a little bit of a strange comparison because we acquired this last first quarter. So -- but if you take WFSI, WFSI has grown earnings at 28% in the first quarter. So we continue a little bit the rhythm of 23% that we delivered last year. And flavors are growing at revenue at 7.8%. So we feel very good about that business. It's a very diversified business. And if anything, we're experiencing COVID with people that come back from this pandemic, like we've seen in Asia, is that people come back with the more -- with an enhanced focus on health and the importance of quality nutrition for their well-being. So we've seen the probiotics.

**Our Health & Wellness segment is up, like, 24% in terms of revenue**, because the sales of those products are -- for humans is, has been probably reemphasized by all this COVID. S*o we think that we are in the right segments. We think we have the right product mix. So we feel very bullish about continuing this performance for the Nutrition business.*

42. In an earnings call on July 30, 2020, Defendant Young also stated:

**Our Nutrition business continued to deliver significant growth, with 35% year-over-year profit improvement for the quarter.** Over the first half of the year, adjusted profit for Nutrition is up more than 50%. And despite some COVID-19 impacts, revenue is up about 8% on a constant currency basis, with growth spread across the entire broad portfolio. Human Nutrition results were substantially higher in the second quarter of 2020 versus the second quarter of 2019.

43. On the same call, in response to an analyst's question about Nutrition's role "as a

contributor to the overall company over the long run[,]" Defendant Luciano stated:

Yes. Strategically, Eric, I always have -- we always have 2 north, if you will. One is we want to get to the 10% ROIC. And the second is we saw the opportunity to bring growth into the company with extending our value chain into Nutrition. ***And we always say, you heard me saying, we think that that's a business that could get easily to 25%, 30% of our profits, and it continues to move into that. And to be honest, it's moving probably accelerated -- has accelerated into that number.*** So we might revisit that number. So we don't have a specific number. But all I wanted to express at that point in time is it will be a meaningful contributor because we saw the opportunity. We saw the potential for that business. And now I think that everybody else is realizing.

***At the beginning, we were in an investment phase. So to a certain degree, some of that performance was masked. But now we're looking at what we are doing in -- look at WFSI. WFSI grew 27%. Of course, Animal Nutrition grew much more than that. And when we look at all the microbiome potential there, that's an incredible accelerator that is still very small.*** So I think I answered all before to

Ken. You have to remember, this is at the beginnings of what we can uncover in terms of profitability. We are just delivering while we are building the business. But there is much more that will come from Nutrition. And I think that if our track record serves us in giving you confidence, trust us, much more is coming from Nutrition.

44.     On February 18, 2021, the Company filed its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K").   The 2020 10-K was signed by Defendants Luciano, Young, Burke, Crews, Dufour, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2020 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Luciano and Young.

45.     In the 2020 10-K, Defendants Luciano and Young stated "Nutrition revenues increased 2% to $5.8 billion due to higher sales prices ($0.1 billion)." Defendants Luciano and Young further stated:

> ***Nutrition operating profit increased 37%. Human Nutrition delivered strong performance and growth across its broad portfolio***. Strong execution to meet rising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients. Additional income from fermentation and strong sales for probiotics and fiber drove higher performance in Health & Wellness. Flavors continued to deliver strong results. ***Animal Nutrition results improved year-over-year driven by strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids.***

46.     On March 26, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement").   Defendants Burke, Crews, Dufour, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

47.     The 2021 Proxy Statement called for Company shareholders to: (a) reelect Defendants Burke, Crews, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (b) to elect Defendant Colbert as a director of the Board (c) ratify Ernst &

Young LLP as the Company's registered public accounting firm; and (d) approve, on an advisory basis, the compensation of named executive officers.

48. The 2021 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes.

49. The 2021 Proxy Statement was materially misleading because it failed to disclose that: (a) contrary to the 2021 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Director Defendants were breaching their fiduciary duties; and (b) the Director Defendants Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

50. The 2021 Proxy Statement also failed to disclose: (a) that the Nutrition segment's financial reporting and accounting practices did not provide shareholders with an accurate impression of the Company's performance and future prospects, including reported operating profits; (b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to the Company's business; (c) that, based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about

the Company's Nutrition segment and related financial results, growth, and prospects and (d) that the Individual Defendants failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. As a result, the 2021 Proxy Statement was materially false and misleading.

51. In an earnings call on October 26, 2021, Defendant Young stated that "the Nutrition business remains on its solid growth trajectory with 17% higher revenues and 15% on a constant currency basis and 20% higher profits year-over-year and continued strong EBITDA margins." Defendant Young further stated that: "Looking ahead, *we expect Nutrition to continue on its impressive growth path, with strength across the Human and Animal Nutrition leading to strong year-over-year earnings expansion in the fourth quarter and a 20% full year growth versus 2020*." Defendant Luciano affirmed Nutrition's growth, stating: "Nutrition will continue on its strong growth trajectory, in line with our 15% per annum trend rate goals and on its way to $1 billion in operating profit in the coming years."

52. On February 17, 2022, the Company filed its Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Luciano, Young, Burke, Colbert, Crews, Dufour, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2021 10-K also contained SOX certifications signed by Defendants Luciano and Young.

53. In the 2021 10-K, Defendants Luciano, and Young stated: "Nutrition revenues increased 16% to $6.7 billion due to higher sales prices ($1.0 billion), partially offset by lower sales volumes of ($0.1 billion)." They further represented:

*Nutrition operating profit increased 20%. Human Nutrition results were higher than the prior year. Flavors results were up, driven by strong sales across various market segments. In North America and EMEAI, the flavors business delivered*

*strong volumes and improved product mix, particularly in the beverage segment. Specialty Ingredients delivered sales growth in specialty proteins and improved pricing and product mix*, though results were negatively impacted by the effects of higher production costs, normalization of prices in the wholesale ingredients business, and COVID-related shifts in demand across the portfolio. *Health and Wellness results were strong, with robust demand driving strong results in probiotics and fibers. Animal Nutrition results were higher on favorable results in amino acids, driven by improved margins and product mix, partially offset by lower demand and higher input costs as a result of pandemic effects in South America and Asia.*

54.     On March 22, 2022, the Company filed its proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement").  Defendants Burke, Colbert, Crews, Dufour, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

55.     The 2022 Proxy Statement called for Company shareholders to: (a) reelect Defendants Burke, Crews, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (b) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (c) approve, on an advisory basis, the compensation of named executive officers.

56.     The 2022 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing.

57.     The 2022 Proxy Statement was materially misleading because it failed to disclose that: (a) contrary to the 2022 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (b) certain Defendants at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

58.     The 2022 Proxy Statement also failed to disclose that: (a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of the Company's performance and future prospects, including reported operating profits; (b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to the Company's business; (c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's Nutrition segment and related financial results, growth, and prospects and (d) that the Company failed to maintain adequate internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

59.     During an earnings call on October 25, 2022, Defendant Luthar stated "we expect the fourth quarter for Nutrition this year to be higher than the fourth quarter of 2021, ***with continued strong demand in Human Nutrition more than offsetting adverse currency effects. We expect Nutrition's full year OP growth to be between 15% and 20% on a constant currency basis***."  In response to an analyst's question about ongoing momentum for 2023, Defendant Luciano stated:

We see, as Vikram expressed before, a positive outlook for starches and sweeteners. We have finished some of our contracting, and we see the volume and we see the margins holding or slightly expanding there. ***And we see a continuation of our growth trajectory in Nutrition. When I talk about the pipeline, that's the business in which we have the biggest visibility into the future because these are projects that -- barring any supply issues, we will bring to the P&L.*** So I would say, that is what's -- give us some positive momentum or positive expectations for '23.

And as I explained in the Nutrition question, we have new capacity coming on stream. We have -- we are expanding Biopolis probiotics capacity by a factor of 5. We are bringing a new line for plant-based proteins in Sojaprotein. We are expanding our PetDine capacity. ***So we are bringing a lot of new capacity to bear because we have the pipeline to actually transfer them into profits***. So from what we can see here, and again in a very uncertain world, is we have good -- very good momentum going into 2023.

60.     On February 14, 2023, the Company filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Luciano, Luthar, Burke, Colbert, Collins, Crews, Felsinger, Harrison, Moore, Sanchez, Sandler, Schlitz, and Westbrook. The 2022 10-K also contained SOX certifications signed by Defendants Luciano and Luthar.

61.     In the 2022 10-K, Defendants Luciano and Luthar stated, "Nutrition revenues increased 14% to $7.6 billion due to higher sales prices ($0.2 billion) and higher sales volumes ($0.7 billion)." They further stated:

> ***Nutrition operating profit increased 7%. Human Nutrition delivered higher year-over-year results.*** Flavors results were lower driven by demand fulfillment challenges, the impact of the strong U.S. dollar in EMEA, softer demand in Asia Pacific, and higher costs in North America. Strong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and good demand for texturants offset some higher operating costs to help deliver better year-over-year results in Specialty Ingredients. Health and Wellness was also higher year-over-year, powered by probiotics, including the contribution from the November 2021 Deerland Probiotics and Enzymes acquisition, and robust demand for fiber and Vitamin E. ***Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids.***

62.     During an earnings call on January 26, 2023, Defendant Luciano represented that: "Our Nutrition business continued to outpace the industry, with 18% constant currency revenue growth for the full year. We delivered an impressive 26% year-over-year revenue growth in BioSolutions. ***The portfolio of acquisitions we made in the prior year continued to deliver OP above our financial projections***."

63.     On the same call, in response to an analyst's question about OP growth, Defendant Luciano stated:

> [Y]ou've been witnessing how we built this Nutrition business over the years. ***This is a business that, if I take out the last 3 years, it has been growing OP by 20%,*** CAGR, if you will. So it's a business that we continue to add layers of capabilities so we can continue to win at the customer front, whether it's we go from individual ingredients to systems, where we bring functionality to those systems through bioactives, whether we bring sustainability benefits to that through our decarbonization or Regen Ag.
>
> So we continue to add layers to continue to help customers excel at the consumer level. And we see that in our win rates, and we see that in our pipeline. So we have visibility into that. As Vikram said, maybe some of the categories soften a little bit, ***but our ability to gain share, to win faster than those categories has been demonstrated. I think this year, we grew revenue significantly higher than the market. So when we look forward, as I said in my -- I think one of the earlier answers, we continue to expect bolt-on and M&A -- bolt-on M&A and organic growth.*** We had 4 companies in 2021. ***We're building capabilities and new capacity in 2022 that we're going to see onstream in '23, and we're going to continue to grow that.***

64.     On March 14, 2023, the Company filed its proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Burke, Colbert, Collins, Crews, Felsinger, Harrison, Luciano, Sanchez, Moore, Sandler, Schlitz and Westbrook solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

65.     The 2023 Proxy Statement called for Company shareholders to, *inter alia*: (1) re-elect Defendants Burke, Colbert, Collins, Crews, Harrison, Luciano, Moore, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (2) elect Defendant Brabander to the Board; (3) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (4) approve, on an advisory basis, the compensation of named executive officers.

66.     The 2023 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our Company's degree of tolerance for risk, and the steps management is taking to manage and mitigate our company's risk… The Audit Committee currently maintains responsibility for overseeing our Company's enterprise risk management process and regularly discusses our Company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our Company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing.

67.     The 2023 Proxy Statement was materially misleading because it failed to disclose that: (a) contrary to the 2023 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Director Defendants were breaching their fiduciary duties; and (b) certain Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

68.     The 2023 Proxy Statement also failed to disclose: (a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression

of the Company's performance and future prospects, including reported operating profits; (b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to the Company's business; (c) that, based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's Nutrition segment and related financial results, growth, and prospects and (d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

69. In an earnings call on April 25, 2023, Defendant Luciano continued to promote the Company's growth in Nutrition, stating that "***Nutrition's growth trajectory for the year remains on course with a double-digit increase in our human Nutrition pipeline compared to this point in 2022***." In response to an analyst's question about Nutrition's profits for the year, Defendant Luthar stated: "***In Human Nutrition, as we mentioned, we've got a strong pipeline***." He attributed an expected slowdown in the first half of the year to Animal Nutrition, but assured investors that "we feel good about Animal Nutrition from a turnaround perspective […] we feel strong and good about the 10% plus constant currency OP growth in Nutrition for 2023."

70. In an earnings call on July 25, 2023, Defendant Luciano stated: "***In Nutrition, our unique go-to-market strategy continues to drive a larger sales pipeline and deliver double-digit growth in the Flavors business***[.]" Defendant Luthar reaffirmed the growth of Nutrition, stating:

> ***When looking at Nutrition as a whole, we now expect 2023 results to be similar to the prior years as we expect growth in Human Nutrition to be offset by lower results in Animal Nutrition.*** However, given the increase in customer innovation we've seen in our Flavors business and our recent wins in pipeline growth across Human Nutrition, as well as the actions we are taking in Animal Nutrition, we remain confident about the future outlook and growth prospects for Nutrition.

71. Defendant Luthar also promoted the Company's progress in Flavors in response to an analyst question about the Nutrition segment, stating:

Flavors. Strong pipeline and win rates. We talked about the largest ever pipeline we've had. Flavors actually grew profits in the first half 9%, 20% in Q2. So that's a very good sign of the recovery we are seeing in parts of the Human Nutrition business. ***The other thing that's important to note, Flavors actually contributed almost 50% of the overall operating profit for Nutrition in the first half. So that's an important signal as you think about the future growth of Nutrition***. Yes, that was primarily driven in the beverage category, but we see green shoots of opportunity in the food category as well.

72. In response to an analyst question about "the pathway '24, '25 and kind of the achievability of the prior 2025 target, I believe, $1.2 billion of OP in that [Nutrition] segment[,]" Defendant Luciano stated in pertinent part:

***In the Human Nutrition, margins are much higher and is [sic] continue to make it better and more stickier to customers as we develop better solutions. In Animal Nutrition was a margin up story since they were coming from lower margins. So when you think about our numbers are a combination of applying our growing faster than market and our EBITDA margin on sales to a market number***. Of course, this industry, as you can see by ourselves and our competitors is having through tough times, whether it is because customers are either not innovating fast enough or destocking at this point in time and making sure they have their supply chains in order.

***So to the extent that those projections are going to be reduced, our percentages of applied to those numbers will be a smaller number. So we haven't gone through that because, to be honest, we are looking at how do we address our current challenges. So we're not that worried about 2025 right now, we want to make sure we make all the adjustments that we need to make.*** And maybe as we talk about the adjustment, let me talk a little bit about Animal Nutrition. Animal Nutrition, as we become more into the business, if you will. We know there is a commodity part, and there is a specialty part. The specialty part matches very well with the -- what the playbook that we have in the human side. And that part is growing and we will continue to accelerate. And Vikram said before, we are repurposing resources to add more of that.

73. In an earnings call on October 23, 2023, Defendant Luthar stated:

The plant-based protein market has been experiencing destocking and consumer demand softness over the course of the year that will likely persist into next year.

Given these recent market dynamics, we have re-scoped our Decatur protein modernization investment project to better match the expected lower growth demand environment. Also, we are leveraging our expertise in creation, design and development to differentiate our product offerings to serve evolving consumer needs. *These adjustments will enable a faster pivot to higher growth and more resilient categories such as specialized nutrition, which have synergies across the Nutrition portfolio, and we are rapidly building this revenue pipeline.*

Health and Wellness results were higher year-over-year due to double-digit biotech sales and a favorable impact related to the revised commercial agreement with Spiber. *During the quarter, we realized a significant expansion in our revenue pipeline reinforcing the demand for evidence-based solutions.*

In Animal Nutrition, we are beginning to see the cost optimization actions and the expansion of offerings in the specialty feed and ingredient space from earlier this year, driving improved performance. However, the recovery in the base business was more than offset by normalized year-over-year amino acids margins as well as lower profit contribution from the Pet Solutions business.

Looking forward, we anticipate Flavors to finish the year strong driven by growth in EMEA and North America. Health and Wellness operating profit is expected to finish similar to last year. Animal Nutrition operating profit is expected to continue to recover sequentially quarter-over-quarter. Specialty Ingredients operating profit is expected to be down significantly, impacted by the recent Decatur East incident and demand softness.

*All in, we now expect full year 2023 operating profit for Nutrition to be around $600 million. While our results in 2023 have been below our expectations, we expect Nutrition to return to growth in 2024.*

*We will continue to build on the Flavors momentum from 2023. Health and Wellness should maintain its steady performance. The cost actions in the shopper pivot to higher-margin products will enable Animal Nutrition to drive growth, further reinforced by improved go-to-market capabilities.*

74.     Defendant Luthar then announced a raised 2023 earnings outlook, stating: "Even with the softness in Nutrition, and lower-than-expected profit contributions from Wilmar, we are raising our 2023 earnings outlook again and now anticipate full year EPS in excess of $7 per share." Defendant Luciano affirmed:

*For Nutrition, we expect continued growth in our revenue opportunity pipeline with significant conversions continuing as we move past some near-term demand*

*weakness.* Our expanding results in Flavors continue to signal acceleration across our broader portfolio. We expect the positive revenue growth trends in Health and Wellness to drive into next year, and we're already pivoting Specialty Ingredients towards high potential areas like alternative daily and specialized nutrition.

75.     The statements referenced above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's Nutrition segment and accounting practices, which were known to the Individual Defendants or recklessly disregarded by them as follows: (a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of the Company's performance and future prospects, including reported operating profits; (b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to the Company's business; and (c) that, based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's Nutrition segment and related financial results, growth, and prospects.

## THE TRUTH EMERGES

76.     On January 21, 2024, the Company announced that it had placed its CFO Luthar on leave effective immediately. The Company stated that Defendant Luthar's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain inter-segment transactions." The Company also announced that its investigation was initiated in response to its receipt of a voluntary document request by the SEC.  As a result, the Company delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.

77.     On this news, the Company's common stock dropped by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024.

## DAMAGE TO THE COMPANY

### Securities Class Action

78.     On January 24, 2021, a securities class action complaint was filed in the United States District Court for the Northern District of Illinois against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Chow v. Archer-Daniels-Midland Company, et al.*, Case 1:24-cv-00634 (N.D. Ill.) ("Securities Class Action")

79.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

80.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants **over $144.4 million** during the Relevant Period in connection with their respective roles as officers and/or directors of the Company, as follows:

| TOTAL COMPENSATION ($) | | | | |
|---|---|---|---|---|
| **Defendant** | **2020** | **2021** | **2022** | **2023** | **Total** |
| Luciano | 22,749,628 | 23,508,841 | 24,749,178 | 24,414,668 | 95,422,315 |
| Young | 8,813,194 | 8,094,974 | 7,755,200 | - | 24,663,368 |
| Luthar | - | - | 4,438,427 | 4,516,241 | 8,954,668 |
| Burke | 300,000 | 329,735 | 347,369 | 384,355 | 1,361,459 |
| Brabander | - | - | - | 214,968 | 214,968 |

| | | | | | |
|---|---|---|---|---|---|
| Colbert | - | 207,038 | 329,209 | 337,107 | 873,354 |
| Collins | - | - | 133,514 | 328,453 | 461,967 |
| Crews | 325,000 | 397,773 | 424,279 | 451,421 | 1,598,473 |
| Dufour | 300,000 | 347,738 | 137,026 | - | 784,764 |
| Felsinger | 330,000 | 464,704 | 503,904 | 280,295 | 1,578,903 |
| Harrison | 310,000 | 345,995 | 372,058 | 383,592 | 1,411,645 |
| Moore | 320,000 | 441,798 | 465,414 | 495,912 | 1,723,124 |
| Sanchez | 300,000 | 346,352 | 360,959 | 140,140 | 1,147,451 |
| Sandler | 300,000 | 341,694 | 361,484 | 368,491 | 1,371,669 |
| Schlitz | 300,000 | 324,039 | 341,074 | 350,724 | 1,315,837 |
| Westbrook | 320,000 | 405,072 | 419,575 | 428,053 | 1,572,700 |
| **TOTAL** | **34,667,822** | **35,555,753** | **41,138,670** | **33,094,420** | **144,456,665** |

81.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

82.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

83.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

84.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

85.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

86.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

87.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Audit Committee Charter**

88.     The Audit Committee assists the Board in the oversight of (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the

effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function.

89.     The Audit Committee Charter states in relevant part:

Authority and Responsibilities

The Committee shall provide assistance to the Board in fulfilling its oversight responsibility to the shareholders relating to the Company's financial statements and the financial reporting process, preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, the systems of internal accounting and financial controls, the internal audit function, the tax function, the annual independent audit of the Company's financial statements, the Company's major risk exposures, the legal compliance and ethics programs as established by management and the Board, and the Company's compliance function. The Committee shall assure that the corporate information gathering, analysis, and reporting systems developed by management represent a good faith attempt to provide senior management and the Board with information regarding material acts, events, and conditions within the Company.

The Committee shall be directly responsible for the appointment, compensation, retention, and oversight of the independent registered public accounting firm, including the resolution of any disagreements between management and the independent registered public accounting firm regarding financial reporting, and each independent registered public accounting firm shall report directly to the Committee. The Committee shall maintain free and open communication with the independent registered public accounting firm, the internal auditors, the Chief Compliance Officer, and management of the Company in fulfilling these responsibilities.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company and the power to retain external counsel or other experts or advisers for this purpose. The Committee shall approve the fees and other retention terms related to any such external counsel, experts, and advisors retained by the Committee. In addition, the Committee will promulgate, and have the authority to assure adherence to, policies and procedures regarding compliance with the law and procedures for circulating these policies and for educating employees regarding compliance with these policies. The Committee shall establish and maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and the confidential, anonymous submission by employees of concerns regarding accounting or auditing matters, including any allegations of

fraud or material misuse of Company resources. The Committee shall perform such other duties and responsibilities as may be assigned to the Committee by the Board.

**Sustainability And Corporate**
**Responsibility Committee Charter**

90.     The Sustainability and Corporate Responsibility Committee shall (1) have oversight responsibility for the Company's corporate objectives, goals, strategies, and activities relating to sustainability and corporate responsibility, and (2) assist the Board in ensuring that the Company operates as a sustainable organization and responsible corporate citizen in order to enhance shareholder value and protect the Company's reputation.

91.     The Sustainability and Corporate Responsibility Committee Charter states:

Authority and Responsibilities

[] The Committee shall oversee (a) the Company's objectives, goals, strategies, and activities relating to sustainability and corporate responsibility, including workplace safety, process safety, environmental, social well-being, diversity and inclusion, corporate giving, and community relations, (b) the Company's compliance with sustainability and corporate responsibility laws and regulations, and (c) the Company's performance relating to its sustainability and corporate responsibility goals and industry benchmarks.

[] The Committee shall receive and review reports from management regarding (a) the Company strategies and activities to support the Company's sustainability and corporate responsibility objectives, (b) the Company's compliance with sustainability and corporate responsibility laws and regulations, (c) the Company's performance relating to its sustainability and corporate responsibility goals and industry benchmarks, (d) significant risks to, and the physical security of, the Company's facilities and employees and the public, (e) significant sustainability and corporate responsibility litigation and regulatory proceedings in which the Company is or may become involved, (f) trends, risks, legislations, regulations, public policies, judicial decisions, treaties, protocols, or medical or scientific developments relating to sustainability and corporate responsibility that may have a material effect on the Company's business, and (g) the Company's relationships with key sustainability and corporate responsibility stakeholders and the issues raised by those stakeholders.

[] The Committee shall perform such other duties and responsibilities as may be assigned to the Committee by the Board.

[] The Committee shall have authority to obtain advice and assistance from internal or external legal, accounting, sustainability, corporate responsibility, or other advisors. The Committee shall approve the fees and other retention terms related to any such advisors retained by the Committee.

[] The Committee may form and delegate authority to subcommittees where appropriate.

[] The Committee shall conduct an evaluation of its performance on an annual basis.

[] All actions of the Committee shall be regularly reported to the Board or submitted to the Board for ratification.

[] The Committee periodically shall review and assess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

## DUTIES OF THE DIRECTOR DEFENDANTS

92.     As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

93.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

94.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

95.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

96.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

97.      Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

98.      The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

100.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

101.    Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

102.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

103.    The Company Board is currently comprised of eleven (11) members – Defendants Luciano, Burke, Colbert, Collins, Crews, Brabander, Harrison, Moore, Sandler, Schlitz, and Westbrook.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e., six* (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

104.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

33

105.	The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

106.	Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

107.	Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

### Defendant Luciano

108.	Defendant Luciano is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with ADM, making him not independent, as admitted by the Company in its 2024 Proxy Statement.  As such, Defendant Luciano cannot independently consider any demand to sue himself for breaching his fiduciary duties to ADM, because that would expose him to liability and threaten his livelihood.

109.     As CEO, Defendant Luciano also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Luciano could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Luciano is therefore futile.

110.     In addition, Defendant Luciano receives lucrative compensation in connection with his employment with the Company. Defendant Luciano is not independent from Defendants Westbrook, Colbert, Collins, and Schiltz as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Luciano. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Luciano could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

111.     Defendant Luciano has served as a Company director at all relevant times hereto. As a director, Defendant Luciano was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Luciano failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

112.    As a trusted Company director, Defendant Luciano conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

113.    Moreover, Defendant Luciano signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Luciano faces a substantial likelihood of liability therefor.

114.    Because of Defendant Luciano's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Luciano is unable to comply with his fiduciary duties and prosecute this action.  Defendant Luciano is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

115.    Defendant Luciano also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Luciano secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) his executive compensation. Accordingly, Defendant Luciano faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

116.    Defendant Luciano is neither independent nor disinterested. Any demand upon Defendant Luciano is futile and, thus, excused.

**Defendant Burke**

117.    Defendant Burke has served as a Company director at all relevant times hereto. As a director, Defendant Burke was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Burke failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

118.    As a trusted Company director, Defendant Burke conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

119.    Defendant Burke also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Burke is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Burke failed to fulfil these additional duties by allowing the false and misleading statements to be

made and also by not correcting them. Therefore, Defendant Burke faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

120.    Moreover, Defendant Burke signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Burke faces a substantial likelihood of liability therefor.

121.    Additionally, in connection with his role as a Company director, Defendant Burke receives substantial income. Accordingly, Defendant Burke cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

122.    Defendant Burke also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Burke secured, *inter alia*: (i) the re-election of himself along with Defendants Crews, Collins, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Burke faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

123.    Defendant Burke is neither independent nor disinterested. Any demand upon Defendant Burke is futile and, thus, excused.

**Defendant Colbert**

124.    Defendant Colbert has served as a Company director at all relevant times hereto. As a director, Defendant Colbert was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately

guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Colbert failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

125. As a trusted Company director, Defendant Colbert conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

126. Defendant Colbert also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Colbert is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Colbert failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Colbert faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

127. Additionally, in connection with his role as a Company director, Defendant Colbert receives substantial income. Accordingly, Defendant Colbert cannot reasonably and objectively

consider a demand to sue the Board who control his continued compensation, including himself.

128.    Moreover, Defendant Colbert signed and therefore personally made the false and misleading statements contained in the 2021 10-K and 2022 10-K. As such, Defendant Colbert faces a substantial likelihood of liability therefor.

129.    Defendant Colbert also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Colbert secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Colbert faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

130.    Defendant Colbert is neither independent nor disinterested. Any demand upon Defendant Colbert is futile and, thus, excused.

**Defendant Collins**

131.    Defendant Collins has served as a Company director at all relevant times hereto. As a director, Defendant Collins was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Collins failed to fulfil

40

these duties by permitting the false and misleading statements to be made and not correcting those statements.

132. As a trusted Company director, Defendant Collins conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

133. Additionally, in connection with his role as a Company director, Defendant Collins receives substantial income. Accordingly, Defendant Collins cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

134. Moreover, Defendant Collins signed and therefore personally made the false and misleading statements contained in the 2022 10-K. As such, Defendant Collins faces a substantial likelihood of liability therefor.

135. Defendant Collins also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Collins secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Collins faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

136. As noted in the Company's 2024 Proxy Statement, Defendant Collins was, during the Relevant Period, a director of Cibus, Inc. and Pivot Bio which are companies that ADM had

purchases from or sales to in 2023. As a result, Defendant Collins is not a disinterested director because he has a material interest in ADM's business with Cibus and Pivot Bio, thus impairing his independence.

137.    Defendant Collins is neither independent nor disinterested. Any demand upon Defendant Collins is futile and, thus, excused.

**Defendant Crews**

138.    Defendant Crews has served as a Company director at all relevant times hereto. As a director, Defendant Crews was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Crews failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

139.    As a trusted Company director, Defendant Crews conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

140.    Additionally, in connection with his role as a Company director, Defendant Crews receives substantial income. Accordingly, Defendant Crews cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

141.    Moreover, Defendant Crews signed and therefore personally made the false and

42

misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Crews faces a substantial likelihood of liability therefor.

142.    Defendant Crews also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Crews secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Collins, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Crews faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

143.    As noted in the Company's 2024 Proxy Statement, Defendant Crews was, during the Relevant Period, a director of WestRock Company which ADM had purchases from or sales to in 2023. As a result, Defendant Crews is not a disinterested director because he has a material interest in ADM's business with WestRock, thus impairing his independence.

144.    Moreover, Defendant Crews has a longstanding business relationship with Defendant Harrison, stemming from at least 2020. Since 2015, Defendant Crews has served as a director of WestRock Company. At the same time, Defendant Harrison has also served as a director of WestRock Company since 2020. Thus, since 2020, Defendants Crews and Harrison have worked together at WestRock and have built a professional relationship with one another. As such, they are incapable of independently and disinterestedly considering a demand to sue each other.

145.    Defendant Crews is neither independent nor disinterested. Any demand upon Defendant Crews is futile and, thus, excused.

**Defendant Brabander**

146.    Defendant Brabander has served as a Company director at all relevant times hereto. As a director, Defendant Brabander was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Brabander failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

147.    As a trusted Company director, Defendant Brabander conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

148.    Defendant Brabander also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant de Brabander is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Brabander failed to fulfil these additional duties by allowing the false and misleading statements

to be made and also by not correcting them. Therefore, Defendant Brabander faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

149. Additionally, in connection with her role as a Company director, Defendant Brabander receives substantial income. Accordingly, Defendant Brabander cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

150. As noted in the Company's 2024 Proxy Statement, Defendant Brabander was, during the Relevant Period, and is the Executive Vice President of Innovation and Regulatory Affairs at Elanco, which ADM does business with. As a result, Defendant Brabander is not a disinterested director because she has a material interest in, and stands to benefit from, ADM's business with Elanco, thus impairing her independence.

151. Defendant Brabander is neither independent nor disinterested. Any demand upon Defendant Brabander is futile and, thus, excused.

**Defendant Harrison**

152. Defendant Harrison has served as a Company director at all relevant times hereto. As a director, Defendant Harrison was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Harrison failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

153. As a trusted Company director, Defendant Harrison conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

154. Defendant Harrison also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Harrison is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Harrison failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Harrison faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

155. Additionally, in connection with her role as a Company director, Defendant Harrison receives substantial income. Accordingly, Defendant Harrison cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

156. Moreover, Defendant Harrison signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Harrison faces a substantial likelihood of liability therefor.

157. Defendant Harrison also solicited the Proxy Statements through the Relevant

Period which contained the false and misleading information as alleged herein. As a result, Defendant Harrison secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Moore, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Harrison faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

158.    As noted in the Company's 2024 Proxy Statement, Defendant Harrison was, during the Relevant Period, a director of WestRock Company and Ashland Global Holdings, which ADM had purchases from or sales to in 2023. As a result, Defendant Harrison is not a disinterested director because she has a material interest in ADM's business with WestRock and Ashland Global, thus impairing her independence.

159.    Moreover, Defendant Harrison has a longstanding business relationship with Defendant Crews, stemming from at least 2020. Since 2020, Defendant Harrison has served as a director of WestRock Company. At the same time, Defendant Crews has also served as a director of WestRock Company since 2015. Thus, since 2020, Defendants Harrison and Crews have worked together at WestRock and have built a professional relationship with one another. As such, they are incapable of independently and disinterestedly considering a demand to sue each other.

160.    Defendant Harrison is neither independent nor disinterested. Any demand upon Defendant Harrison is futile and, thus, excused.

**Defendant Moore**

161.    Defendant Moore has served as a Company director at all relevant times hereto. As

a director, Defendant Moore was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Moore failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

162.    As a trusted Company director, Defendant Moore conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

163.    Defendant Moore also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Moore is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Moore failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Moore faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

48

164. Additionally, in connection with his role as a Company director, Defendant Moore receives substantial income. Accordingly, Defendant Moore cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

165. Moreover, Defendant Moore signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Moore faces a substantial likelihood of liability therefor.

166. Defendant Moore also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Moore secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Luciano, Sandler, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Moore faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

167. Defendant Moore is neither independent nor disinterested. Any demand upon Defendant Moore is futile and, thus, excused.

**<u>Defendant Sandler</u>**

168. Defendant Sandler has served as a Company director at all relevant times hereto. As a director, Defendant Sandler was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries,

and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Sandler failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

169. As a trusted Company director, Defendant Sandler conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

170. Defendant Sandler also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Sandler is required to oversee, *inter alia*: (1) the integrity of the financial statements of the Company, (2) the effectiveness of the internal control over financial reporting, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function. Despite this, Defendant Sandler failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Sandler faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

171. Additionally, in connection with her role as a Company director, Defendant Sandler receives substantial income. Accordingly, Defendant Sandler cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

172. Moreover, Defendant Sandler signed and therefore personally made the false and

misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Sandler faces a substantial likelihood of liability therefor.

173.     Defendant Sandler also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Sandler secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Schlitz, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Sandler faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

174.     As noted in the Company's 2024 Proxy Statement, Defendant Sandler was, during the Relevant Period, a director of Keurig Dr. Pepper Inc. and Pharmavite, which ADM had purchases from or sales to in 2023. As a result, Defendant Sandler is not a disinterested director because she has a material interest in ADM's business with Keurig Dr. Pepper Inc. and Pharmavite, thus impairing her independence.

175.     Defendant Sandler is neither independent nor disinterested. Any demand upon Defendant Sandler is futile and, thus, excused.

**Defendant Schlitz**

176.     Defendant Schlitz has served as a Company director at all relevant times hereto. As a director, Defendant Schlitz was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time;

(iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Schlitz failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

177. As a trusted Company director, Defendant Schlitz conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

178. Additionally, in connection with her role as a Company director, Defendant Schlitz receives substantial income. Accordingly, Defendant Schlitz cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

179. Moreover, Defendant Schlitz signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Schlitz faces a substantial likelihood of liability therefor.

180. Defendant Schlitz also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Schlitz secured, *inter alia*: (i) the re-election of herself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Sandler, and Westbrook to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Schlitz faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation

demand.

181.    As noted in the Company's 2024 Proxy Statement, Defendant Schlitz was, during the Relevant Period, and is the Vice President and President, Global Products at Johnson Controls, which ADM had purchases from or sales to in 2023. As a result, Defendant Schlitz is not a disinterested director because she has a material interest in, and stands to benefit from, ADM's business with Johnson Controls, thus impairing her independence.

182.    Defendant Schlitz is neither independent nor disinterested. Any demand upon Defendant Schlitz is futile and, thus, excused.

**Defendant Westbrook**

183.    Defendant Westbrook has served as a Company director at all relevant times hereto. As a director, Defendant Westbrook was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Westbrook failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

184.    As a trusted Company director, Defendant Westbrook conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

185.    Additionally, in connection with his role as a Company director, Defendant

Westbrook receives substantial income. Accordingly, Defendant Westbrook cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

186. Moreover, Defendant Westbrook signed and therefore personally made the false and misleading statements contained in the 2020 10-K, 2021 10-K and 2022 10-K. As such, Defendant Westbrook faces a substantial likelihood of liability therefor.

187. Defendant Westbrook also solicited the Proxy Statements through the Relevant Period which contained the false and misleading information as alleged herein. As a result, Defendant Westbrook secured, *inter alia*: (i) the re-election of himself along with Defendants Burke, Crews, Collins, Colbert, Harrison, Moore, Luciano, Sandler, and Schlitz to the Board, thus enabling them to continue to breach their fiduciary duties and commit other wrongdoing, and (ii) executive compensation. Accordingly, Defendant Westbrook faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

188. As noted in the Company's 2024 Proxy Statement, Defendant Westbrook was, during the Relevant Period, a director of Mosaic Company and T-Mobile US, Inc., which ADM had purchases from or sales to in 2023. As a result, Defendant Westbrook is not a disinterested director because he has a material interest in ADM's business with Mosaic Company and T-Mobile US, Inc, thus impairing his independence.

189. Defendant Westbrook is neither independent nor disinterested. Any demand upon Defendant Westbrook is futile and, thus, excused.

## Additional Reasons Demand is Futile

190.     The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

191.     The Company, at all material times, had its corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this corporate governance, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

192.     In violation of the of their duties to the Company, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of their fiduciary duties, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

193.     The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

194.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

195.     Publicly traded companies, such as ADM, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

196.     Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## COUNT I

### (Director Defendants for Violations of
### Section 14(a) of the Exchange Act)

197.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.     Section 14(a) Exchange Act claims are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Section 14(a) claims alleged do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

199.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

200.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

201.    Under the direction and watch of the Director Defendants, the Company's 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

202.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading.  The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, and ratification of the Company's independent auditor.

203.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

204.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

### (Against the Individual Defendants for Breach of Fiduciary Duties)

205.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

206.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

207.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

208.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

209.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210.     As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT III

### (Against the Individual Defendants for Gross Mismanagement)

211.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

212.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

213. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

214. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

### (Against the Individual Defendants for Waste of Corporate Assets)

215. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

216. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

217. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

218. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

### (Against the Individual Defendants for Unjust Enrichment)

219. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

221.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

222.     Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT VI

### (Against the Director Defendants for Aiding and Abetting)

223.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.     The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

225.     Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

226. As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

227. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

228. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 12, 2024

By: /s/ Carl V. Malmstrom
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60602
Tel: (312) 984-0000
Fax: (212) 686-0114
Email: malmstrom@whafh.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email:  tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***